**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua D. Bendor (No. 031908)
Hayleigh S. Crawford (No. 032326)
Nathan T. Arrowsmith (No. 031165)
Joshua G. Nomkin (No. 039213)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Hayleigh.Crawford@azag.gov
Nathan.Arrowsmith@azag.gov
Joshua.Nomkin@azag.gov
ACL@azag.gov

*Attorneys for Defendants State of Arizona and Arizona Board of Regents*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>State of Arizona; Arizona Board of Regents,<br><br>Defendants. | No. 2:26-cv-06101-GMS<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**<br><br>(Oral Argument Requested)<br><br>(Hon. G. Murray Snow) |

The Court should dismiss with prejudice because the Government lacks standing, argues an express preemption theory contrary to § 1623's plain text, and attempts to apply a federal statute in excess of Congress's enumerated Article I authority.

**I. The Government lacks standing.**

Article III jurisdiction demands concrete and particularized injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The Government does not dispute that its complaint fails to allege the sort of injury that courts have found sufficient for standing in this context, such as disruption to immigration enforcement. Instead, it doubles down on its theory that just alleging express preemption suffices for standing. *E.g.*, Resp. 7 ("The United States sues as a sovereign to vindicate its own law. That is concrete harm.").

Specifically, the Government posits (at 2, 4-5) that where the United States sues as a sovereign, a claimed violation of federal law is itself a concrete harm. Under this approach, it argues that the very fact of preemption shows interference with immigration enforcement. *Id.* at 7 ("A State that hands unlawfully present aliens the very benefit Congress withheld clearly 'interferes with immigration enforcement.'").

But the Government's cited authorities show the opposite. In the cases on which it relies, the courts pointed to concrete injury beyond the alleged violation of the federal law in question. *See, e.g.*, *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (explaining that alleged violation of False Claims Act, which imposes civil liability for knowingly presenting false claims for payment to the U.S. government, alleged "proprietary injury [to the Government] resulting from the alleged fraud").[1]

Consider *United States v. Missouri*, where the U.S. had standing to challenge a Missouri act purporting to prohibit state officials from enforcing certain federal gun laws. 114 F.4th 980, 983-84 (8th Cir. 2024). There, the U.S. alleged concrete and particularized injury to its ability to enforce federal law not because the act violated federal law on its

---

[1] Importantly, while *Vt. Agency* noted that "injury to [the U.S.'] sovereignty arising from violation of its laws … suffices to support *a criminal lawsuit* by the Government," it relied on the separate proprietary injury resulting from the alleged fraud as the basis for civil action. 529 U.S. at 771 (emphasis added).

face, but because it caused state officials to withdraw from joint task forces and other collaborative enforcement efforts with the federal government. *Id.* at 984. Or take *United States v. Idaho*, 623 F. Supp. 3d 1096, 1107 (D. Idaho 2022), where the court found that the U.S. had standing to seek an injunction of an Idaho law that allegedly conflicted with the federal Emergency Medical Treatment and Labor Act (EMTALA). The U.S. alleged not only that Idaho's law violated EMTALA, but also that the law would harm pregnant patients and deprive the federal government "of the benefits of its bargain in that it has provided Medicare funding to hospitals within Idaho, and that funding was conditioned on those hospitals' compliance with EMTALA." *Id.*

These authorities underscore that standing requires allegations of injury beyond claimed preemption. *See, e.g.*, *Sanitary Dist. v. United States*, 266 U.S. 405, 425 (1925) (diversion of water frustrated treaty obligations and "sovereign[n] power to regulate commerce and to control the navigable waters"). As other district courts have held, "the mere *existence* of a preempted state law" does not provide a concrete injury. *United States v. California*, 824 F. Supp. 3d 1079, 1083 (C.D. Cal. 2026); *accord United States v. City of Boston*, 833 F. Supp. 3d 30, 45 (D. Mass. 2026)), *appeal filed*, No. 26-1852 (1st Cir.); *see also United States v. Michigan*, No. 1:26-CV-246, 2026 WL 3088394, at *4 & n.2 (W.D. Mich. Oct. 7, 2026) (finding similarly and rejecting reliance on *KalshiEX LLC v. Johnson*, which addressed "allegations of impeded federal enforcement").

The Government responds that *California* rejected standing premised on the "mere existence" of a preempted law, whereas here, the Government "pleads implementation." Resp. 6. But *California* also made clear that injury based on the implementation of an allegedly preempted law still requires allegations of concrete and particularized harm. The court explained, "Perhaps California's *enforcement* of the subject laws and regulations could give rise to an injury in fact by impeding the operations or functions of the federal government, but Plaintiff neither pleads nor presents such a theory." *Id.* at 1084. The same is true here. The Government alleges that Arizona passed and implemented Prop. 308, but fails to connect that implementation to an impediment of the

Government's operations or functions. *Cf. Missouri*¸ 114 F.4th at 985 (finding injury where government alleged state law's implementation reduced resources available for federal law enforcement).

Unable to identify contrary authority, the Government resorts to tilting at windmills. For example, it suggests that *GEO Grp., Inc. v. Newsom* and *United States v. King County* are inapposite because "neither held that operational disruption is the *only* sovereign injury." Resp. 7. But Arizona has not argued otherwise. It cites these cases to illustrate the types of concrete, particularized harm that *can* demonstrate Article III injury in this context. Nor does it matter that these cases dealt with obstacle preemption rather than express preemption. *See id.* The Government cites no authority applying different injury-in-fact inquiries depending on the type of preemption asserted.

Ultimately, the Government rests on an allegation that "Congress itself expressly declared the state policy incompatible with federal law." *Id.* But a congressional declaration is not injury in fact. "Any lesser standard than a showing of actual injury to those who assert standing," including sovereigns, would raise serious separation of powers concerns. *United States v. Mattson*, 600 F.2d 1295, 1300 (9th Cir. 1979).

**II. Section 1623 does not expressly preempt A.R.S. § 15-1803.**

The parties agree that the Government's claims turn on 8 U.S.C. § 1623(a)'s plain text. *See* Mot. 7; Resp. 8. The statute imposes an equal treatment rule regarding how States may make noncitizens not lawfully present eligible for a postsecondary education benefit on the basis of residence. Because § 15-1803 does not provide a residence-based benefit and otherwise provides equal treatment, the Government's claims fail.[2]

**A. The Eligibility Clause uses non-residence criteria.**

The Government does not dispute the Motion's essential underpinnings. It does not dispute that § 1623 defines residence as "the place of general abode; the place of

---

[2] The Government is incorrect in claiming (at 13 n.2) that Arizona has waived arguments about dismissal of Count II. Both Count I and Count II challenge § 15-1803, *see* Compl. ¶¶ 50, 53, and Arizona's motion explains why § 1623 does not preempt § 15-1803.

general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). Nor does it contest that § 1623 is triggered only if residence is a but-for cause of eligibility for a postsecondary education benefit.

With that underbrush cleared, not much of the Government's case remains. The Eligibility Clause permits nonresidents to obtain in-state tuition, and it does not make all residents eligible. To qualify, students must have "[a]ttended any public or private high school option or homeschool equivalent … while physically present in this state for at least two years" and have "[g]raduated from any public or private high school option or homeschool equivalent … while physically present in this state or obtained a high school equivalency diploma in this state." A.R.S. § 15-1803(B).

On its face, the Eligibility Clause is therefore agnostic about a student's "principal" "residence" or "abode" or "dwelling place." And a "but-for test directs us to change one thing at a time and see if the outcome changes." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Because the Eligibility Clause *excludes* residents and *includes* non-residents, residence cannot be a but-for qualification. As Arizona's Motion described (at 8-9), Arizona residents will not satisfy the Clause if they move to Arizona during the final year of high school. Non-residents will qualify if they cross into the State from another or attended and graduated from a private high school or boarding school. *Id.* And former Arizonans need not surrender their other-state residence to qualify. *Id.* The Eligibility Clause does not require residence because any postsecondary benefit offered under that Clause "would have occurred without it." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013) (citation omitted).

The Government responds (at 10) that "residence is *a* but-for cause" under § 15-1803, even if not the sole cause, because students "need both the schooling and the Arizona presence" to be eligible. But numerous state and federal courts have already rejected the proposition that "schooling" and "presence" amount to "residence."

Over a decade before Arizona enacted the Eligibility Clause, the California Supreme Court determined that providing in-state tuition to "those who attended high

school in California for at least three years and meet … other requirements" is "based on *other* criteria," not residence. *Martinez v. Regents of Univ. of Cal*, 241 P.3d 855, 863-64 (Cal. 2010). Federal district courts in Minnesota and Virginia have reached the same conclusion. *See United States v. Virginia*, No. 3:25-CV-1067, 2026 WL 2984988, at *9 (E.D. Va. Oct. 5, 2026) ("The Tuition Equity Pathway … is not based on residence. It is based on high school attendance in Virginia, graduation from a high school in Virginia, passage of an equivalency test, or income tax return filings."); *United States v. Walz*, 825 F. Supp. 3d 897, 909 (D. Minn. 2026) (concluding that criteria requiring "(1) that the student attended a Minnesota high school for three or more years; and (2) that the student graduated from a Minnesota high school (or achieved the equivalent) … do not require Minnesota residency"), *appeal docketed*, No. 26-1886 (8th Cir.).

Faced with this caselaw, the Government first suggests (at 10-11) that *Walz* and *Virginia* incorrectly required residence to be the *sole* but-for cause of in-state tuition eligibility, as opposed to one basis. Not so. Under the but-for residence test in § 1623(a)'s plain text, if a student's residence is neither sufficient nor necessary to qualify (which it is not under § 15-1803), then § 1623(a)'s condition is not met. *See Bostock*, 590 U.S. at 656 (but-for test requires changing "one thing at a time" to "see if the outcome changes").

Nor do the Government's cases establish that physical presence and school attendance amount to residence. Rather, they concern state laws containing express residence-related requirements missing from § 15-1803. For example, *United States v. Illinois* analyzed a law requiring students to have "resided with a parent or guardian while attending a public or private high school in Illinois" or have "[a]ttended high school while residing in Illinois and … not established residency outside Illinois." No. 25-CV-1691, 2026 WL 2137256, at *1-2 (S.D. Ill. July 24, 2026). Likewise, *United States v. Texas* examined a law requiring Texas high school graduation and maintenance of "a residence continuously in this state" for several years. 181 F.4th 548, 556-57 (5th Cir. 2026). *Texas* held that § 1623(a) preempted this law because "the continuous-residence requirement … is 'the basis' for the provision of postsecondary benefits." *Id.* at 557.

Plucking select quotations, the Government suggests (at 9 and 11) that *Illinois* and *Texas* indicate that high school graduation or attendance is also a residency requirement triggering § 1623. To the contrary, both cases explained where a state law "ties postsecondary education benefits to high-school attendance or graduation in the state *together with residence-related requirements* (such as living with a parent or guardian in the state …)," then *residence* is a necessary, but-for condition triggering preemption. *Illinois*, 2026 WL 2137256, at *9 (emphasis added) (citing *Texas*, 181 F.4th at 556-58)). And *Texas* described a high school graduation requirement as a "proxy" for residence when analyzing whether the graduation requirement was severable from the preempted continuous-residency requirement, 181 F.4th at 560, underscoring that a residence "proxy" is not the same thing as a but-for requirement. Said another way, if *Texas* had considered graduation to be a residence-based requirement, severability would be irrelevant because that provision would likewise trigger § 1623(a)'s preemption.

As an alternative to its proxy arguments, the Government asserts that § 15-1803 requires residence because attendance at an Arizona public school calls for "verifiable documentation of residency in this state." Resp. 9 (quoting A.R.S. § 15-802(B)(1)). But that statute does not make Arizona residence necessary to high school attendance and graduation because numerous other provisions allow non-Arizona residents to attend Arizona public schools. *See* Mot. 10 (citing A.R.S. §§ 15-823(A), (B), (C), (D), (E), (G), (I), (O), 15-823.01(A)). Nor does the Government claim that only Arizona residents may attend a "private high school option or homeschool equivalent," although the Eligibility Clause allows those students to qualify for in-state tuition, too. A.R.S. § 15-1803(B). *See also* Resp. 10 (admitting "nonresident commuters" may qualify).

**B. The Eligibility Clause provides equal treatment.**

Even if the Eligibility Clause is interpreted as a proxy for residence-based benefits, Arizona law satisfies § 1623's equal-treatment requirement. Section 1623's "unless" clause provides that States making "a citizen or national of the United States" eligible for a postsecondary education benefit "without regard to whether the citizen or national" is a

State resident may also make a noncitizen who is not lawfully present eligible for the same benefit. "The point is that undocumented students not be treated better than citizens who are not residents of the state." *Virginia*, 2026 WL 2984988, at *11.

Section 15-1803 clears that bar by making "some United States citizens … eligible to receive in-state tuition" regardless of residence when "some undocumented students are eligible." *Id.* Students coming to Arizona from other states, boarding school and out-of-state private school students, and former Arizona residents meet the Eligibility Clause's requirements. Thus "non-resident citizens are eligible for in-state tuition." *Id.* at *13; *see also Walz*, 825 F. Supp. 3d at 912 (describing similar conditions).

In contrast to § 1623's plain text, the Government asserts that the statute requires that States make "the ordinary nonresident citizen" eligible for postsecondary education benefits. Resp. 13. It is unclear whether this is different from its earlier position that "all American citizens" must qualify. Compl. ¶ 22. Regardless, either expansionist requirement would prohibit States from placing any conditions at all on postsecondary education benefits if offered to a single noncitizen not lawfully present on the basis of residence. *Cf.* Resp. 13 (attacking eligibility based on military service, tribal membership, AmeriCorps participation, and ROTC enrollment). But that reading has no basis in § 1623's text, which describes only "a citizen or national of the United States."

The Government otherwise disputes strawmen arguments that Arizona does not make. Arizona does not contend that the "unless" clause turns on the possibility of a single nonresident U.S. citizen obtaining in-state tuition. Mot. 11-12; *cf.* Resp. 11-12. Instead, Arizona argues that § 1623 compares similarly situated citizen non-residents and resident noncitizens unlawfully present. Thus, "use of the word 'a' indicates 'one or more' but not all." *Virginia*, 2026 WL 2984988, at *11. Nor is this reading "self-defeating." Resp. 13. It observes equal treatment, and § 1623's title explains that the statute limits "eligibility for preferential treatment."

Meanwhile, the Government's theory *is* "self defeating," as applied to tuition. It would require that in-state rates be offered "in no less an amount, duration and scope" to

all citizens. *See* 8 U.S.C. § 1623(a). That would make in-state tuition the price of tuition, period, and not a residence-based benefit. "At bottom, the 'unless clause' simply provides that non-resident United States citizens must have the same shot at in-state tuition as do illegal aliens." *Virginia*, 2026 WL 2984988, at *13. Arizona provides that option.

**III. Section 1623 is unconstitutional as applied here.**

Alternatively, Section 1623 lacks preemptive effect because it does not (1) "represent the exercise of a power conferred on Congress by the Constitution" and is not (2) "best read" to "regulate[ ] private actors." *Murphy v. NCAA*, 584 U.S. 453, 477 (2018).

**A. Section 1623 exceeds Congress's enumerated powers.**

The Government seeks to apply § 1623 beyond "the limits on federal power." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Id.* at 533. The Constitution's dual-sovereign structure grants "Congress not plenary legislative power but only certain enumerated powers" and reserves "all other legislative power … for the States." *Murphy*, 584 U.S. at 471. Consequently, "[i]f no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not violate any of the express prohibitions in the Bill of Rights or elsewhere in the Constitution." *Sebelius*, 567 U.S. at 535.

As Arizona's Motion explained (at 13-16), although the Government cites Congress's immigration power as authority for enacting and applying § 1623(a) to Arizona's law, it justifies its actions based on interests unrelated to that power. The Government points to Congress's desire to "encourage self-sufficiency among immigrants, limit their dependence on public assistance, and prevent public benefits from serving as an incentive for illegal immigration." Compl. ¶ 16. Yet it seeks to apply § 1623(a) to preempt state education laws that *promote* self-sufficiency, admits that its primary concern is not immigrant self-sufficiency but preferential treatment vis-à-vis U.S. citizens, and did not allege that Arizona's law incentivizes immigration contrary to Congress's desire. *See* Compl. at ¶¶ 16-19, 25-46 (alleging Congressional purpose in not

incentivizing immigration, but omitting any assertion that § 15-1803 does so).

The Government's Response appears to abandon the self-sufficiency rationale. It instead defaults (at 14) to generally invoking Congress's "broad undoubted power over the subject of immigration and the status of aliens." Citing *Mathews v. Diaz*, 426 U.S. 67, 79-82 (1976), the Government asserts that this includes "the power to decide which public benefits aliens may receive." But *Mathews* said nothing of the sort; whether Congress's immigration authority allowed it to decide eligibility for state benefits was not at issue. Rather, *Mathews* upheld a federal law conditioning alien eligibility for a federal program on admission and continuous residence against Fifth Amendment challenges. *Id.* at 80.

The Government next asserts that § 1623(a) does not regulate education, citing *Illinois*, 2026 WL 2137256, at *8. Arizona disagrees, *see* Mot. 15, but regardless, the burden remains on the Government to identify an enumerated power authorizing § 1623(a). *See Sebelius*, 567 U.S. at 535 ("If no enumerated power authorizes Congress to pass a certain law, that law may not be enacted, even if it would not [otherwise] violate … the Constitution."). Yet its only affirmative argument is a bald assertion that "Section 1623(a) exercises [immigration] power for the reasons Congress gave: public benefits should 'not constitute an incentive for immigration to the United States," and removing that incentive is a 'compelling government interest.' 8 U.S.C. § 1601(2)(B), (6)." Resp. 14. Still missing is *any* explanation of how § 1623(a) reflects these principles. Indeed, it is hard to imagine a plausible explanation given that Arizona's law encourages self-sufficiency through education, and there's no obvious connection between lower college tuition rates and financial aid and the decision to immigrate to the U.S. illegally. And regardless, Congress cannot define its own authority. *See Sebelius*, 567 U.S. at 538 (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)).

The Government's remaining points are defensive, arguing that Arizona's authority is inapposite because it does not "limit[ ] Congress's power" to enact a statute like § 1623(a). *See* Resp. 15. But that gets things exactly backwards. It is incumbent on the United States as a government of limited powers to "show that a constitutional grant

of power authorizes each of its actions." *Sebelius*, 567 U.S. at 535. It is not Arizona's burden, as a State retaining all legislative powers not specifically granted to the federal government, to demonstrate the limits on Congress's legislative power. *See id.* at 533.

Even so, Arizona has shown that § 1623(a) exceeds Congress's immigration authority. *See* Mot. 14-15. In contrast, the Government's unsupported theory of unlimited power is divorced from any connection to "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas v. Bica*, 424 U.S. 351, 355 (1976). Under that theory, Congress can decide "which public benefits aliens may receive," no matter what. Resp. 14. It would permit Congress to regulate even things like public water fountains as a purported "incentive for immigration." That is plainly absurd, but the Response offers no way to differentiate that scenario. Resp. 15 (arguing only that the example is "beside the point").

**B. Section 1623 is unconstitutional commandeering.**

The parties agree that under the anticommandeering doctrine, Congress "lacks the power" to dictate "what a state legislature may and may not do." *Murphy*, 584 U.S. at 472-74. *See* Resp. 16 (using *Murphy*'s test). That means Congress has "the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992).

Violating that rule, the Government seeks to put Arizona "under the direct control of Congress." *Murphy*, 584 U.S. at 474. Section 1623 regulates only States by constraining determination of *eligibility* for residence-based benefits. The Complaint says the statute "is directed at institutional practices, curtailing the authority of educational institutions to grant in-state tuition benefits to undocumented aliens." Compl. ¶ 4 (citation omitted). That is not "best read as" regulating "private actors." *Murphy*, 584 U.S. at 477.

The statutory history only underscores that § 1623 targets States rather than private actors. As the Government notes (at 3), Congress first enacted a law generally prohibiting providing certain "*State* or local public benefit[s]," including postsecondary education benefits, to unlawfully present noncitizens, but left a safety valve allowing a "*State*" to "enact[ ] … a *State law* … which affirmatively provides for such eligibility." 8 U.S.C.

§ 1621(a), (c)(1)(B), (d) (emphases added). By enacting § 1623, the Government says, "Congress removed one benefit from the *States'* discretion." Resp. 3 (emphasis added).

Put another way, under the Government's view, § 1621 categorizes "postsecondary education" as a "State or local public benefit" that could be provided via State law. *See* Resp. 3. Section 1623 then gives "the States" "choices" about such laws: they may "keep the resident/nonresident distinction" but make noncitizens not lawfully present "ineligible for the resident rate," extend "the benefit to citizens without regard to residence," or "award benefits on a basis other than residence." Resp. 13.

These are nothing but "dictate[s]" for "what a state legislature may and may not do." *Murphy*, 584 U.S. at 474. Federal law dictates the timing (after 1996), process (by State law), and content (affirmatively provide on equal grounds to unlawfully present noncitizen residents and citizen residents) of any State's decision to provide residence-based benefits to noncitizens not lawfully present. Only a myopic view of § 1623 would suggest that it "exactly" describes a law that "imposes restrictions or confers rights on private actors." Resp. 16 (citation omitted). And although the Government seeks to defend § 1623 because it "denies permission rather than imposing an affirmative duty," *id.*, that is irrelevant to the "basic principle," that the anticommandeering rule applies when a federal statute "command[s] state legislatures to enact or *refrain from enacting state law*," *Murphy*, 584 U.S. at 475 (emphasis added).

Nor can the Government justify § 1623 as an "evenhanded regulation of state and private actors," Resp. 17, in a way that supports § 1623's constitutionality. Section 1623's Title 8 subchapter is titled "Eligibility for State and Local Public Benefits Programs," something that private actors plainly do not provide. And the Response does not explain how private actors may determine postsecondary education benefit eligibility based on residence, especially where it insists that § 1621 requires "enactment of a State law" and § 1623 "removed one benefit from the States' discretion." Resp. 3.

**CONCLUSION**

The Court should dismiss the Complaint in full with prejudice.

RESPECTFULLY SUBMITTED this 20th day of November, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By /s/ Hayleigh S. Crawford
Joshua D. Bendor
Hayleigh S. Crawford
Nathan T. Arrowsmith
Joshua G. Nomkin
Office of the Arizona Attorney General
2005 N. Central Ave.
Phoenix, AZ 85004-1592
Telephone: (602) 542-3333

*Attorneys for Defendants State of Arizona and Arizona Board of Regents*